1  ROBERT J. ROSATI, No. 112006
   robert@erisalg.com
2  THORNTON DAVIDSON, No. 166487
   thornton@erisalg.com
3  ERISA Law Group LLP
   2055 San Joaquin Street
4  Fresno, California 93721
   Telephone: 559-256-9800
5  Facsimile: 559-256-9800

6  Attorneys for Plaintiff,
   KAREN KNIPPING

7

8           UNITED STATES DISTRICT COURT FOR

9           THE NORTHERN DISTRICT OF CALIFORNIA

10 KAREN KNIPPING,                    )   CASE NO.
                                      )   C13-2474 RS
11                                    )
                                      )
12              Plaintiff,            )   COMPLAINT FOR DECLARATORY
                                      )   RELIEF FOR LTD BENEFITS
13 v.                                 )
                                      )
14                                    )
                                      )
15 CROWLEY HOLDINGS, INC.,            )
   EMPLOYEE BENEFIT PLAN; SUN LIFE    )
16 ASSURANCE COMPANY OF CANADA,       )
                                      )
17              Defendants.           )
                                      )
18 _____  )

19

20

21      Plaintiff, KAREN KNIPPING ("Plaintiff" or "Knipping") alleges as follows:

22                        **JURISDICTION**

23      1.      Plaintiff's claims for relief arise under the Employee Retirement Income Security

24 Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1). Pursuant to 29 U.S.C.

25 section 1331, this Court has jurisdiction over this action because this action arises under the laws

26 of the United States of America. 29 U.S.C. section 1132(e)(1) provides for federal district court

27 jurisdiction of this action.

28 ///

1

<u>**VENUE**</u>

2    2.    Venue is proper in the Northern District of California in that Defendants may be

3  found in this district and Defendant Plan was previously administered in this district and may

4  still be partially administered in this district. Therefore, 29 U.S.C. section 1132(e)(2) provides

5  for venue in this court.

6

<u>**PARTIES**</u>

7    3.    Plaintiff is, and at all times relevant hereto was, a participant, as that term is

8  defined by 29 U.S.C. section 1002(7), of Crowley Holdings, Inc., Employee Benefit Plan ("The

9  Plan") and thereby entitled to receive long term disability ("LTD") and Life Insurance Waiver of

10  Premium ("WOP") benefits therefrom. Plaintiff was a participant because she was an employee

11  of Crowley Maritime, Inc., one of the companies for whose employees' benefit The Plan was

12  established.

13    4.    Defendant Sun Life Assurance Company of Canada ("Sun Life") issued group

14  policy No. 203005 ("The Policy") to Crowley Maritime, with a policy effective date of January 1,

15  2010, as follows:

16        A.    Originally, The Policy was issued to Crowley Maritime Corporation.

17        B.    The Policy was retroactively amended, with a handwritten date of April 4,

18              2011, and a typewritten date of October 16, 2012, and an effective date of

19              January 1, 2010, to Crowley Holdings, Inc.

20        C.    The two versions of The Policy have materially different terms, but it

21              appears and therefore Knipping alleges that the provisions, as retroactively

22              amended, reflect the actual intent of the parties and the actual terms of The

23              Policy.

24        D.    All versions of The Policy provide, in part, "The Policy is issued in

25              California and is subject to the laws of that jurisdiction."

26  Sun Life thereby insured The Plan and is obligated to provide all benefits claimed, and acted on

27  behalf of The Plan in all matters alleged herein, including making the decisions to deny Plaintiff's

28  LTD benefits and to deny her administrative appeal of that decision.

1      5.      Defendant, The Plan, is an employee welfare benefit plan organized and operating

2    under the provisions of ERISA, 29 U.S.C. section 1001, *et sec.*

3                                **FIRST CLAIM FOR RELIEF**
                                (For Reinstatement of Benefits)

4      6.      Plaintiff was employed by Crowley Maritime Corporation as a software

5    developer.

6      7.      Knipping became disabled effective July 29, 2010.

7      8.      The Policy provides for long term disability benefits after an elimination period of

8    180 days, for which a person under the age of 63 at the time the disability occurred, as was

9    Plaintiff herein, such benefits potentially could continue to age 67.

10     9.      The following pertinent definitions and provisions are provided in The Policy

11   regarding LTD benefits:

12          A.      Total Disability or Totally Disabled means:

13          "[D]uring the Elimination Period and the next 24 months, the

14          Employee, because of Injury or Sickness, is unable to perform

15          Material and Substantial Duties of his Own Occupation. After Total

16          or Partial Disability benefits combined have been paid for 24 months,

17          the Employee will continue to be Totally Disabled if he is perform

18          with reasonable continuity any Gainful Occupation for which he is or

19          becomes reasonably qualified for by education, training or

20          experience."

21

22          B.      Partial Disability or Partially Disabled means:

23          "[D]uring the Elimination Period and the next 24 months, the

24          Employee, because of Injury or Sickness, is unable to perform the

25          Material and Substantial Duties of his Own Occupation and the

26          Employee has Disability Earnings of less than 80% of his Indexed

27          Total Monthly Earnings. After Total or Partial Disability benefits

28

                                    COMPLAINT
                                        3

1    combined have been paid for 24 months, the Employee will continue

2    to be Partially Disabled if he is unable to perform with reasonable

3    continuity any gainful Occupation for which he is or becomes

4    reasonably qualified for by education, training or experience and the

5    Employee has Disability Earnings of less than 66.67% of his Indexed

6    Total Monthly Earnings."

7    C.    Own Occupation means:

8    "[T]he usual and customary employment, business, trade, profession

9    or vocation that the Employee performed immediately prior to the

10    first date Total or Partial Disability began. Own Occupation is not

11    limited to the job or position the Employee performed for the

12    Employer or performed at any specific location."

13    D.    Material and Substantial Duties means, but is not limited to, the essential

14          tasks, functions, skills or responsibility required by employers for the

15          performance of the Employee's Own Occupation.

16    E.    Gainful Occupation means employment that is or can be expected to

17          provide an Employee with an income o at least 66.67% of his Indexed

18          Total Monthly Earnings.

19    10.    Plaintiff applied for Life Insurance WOP benefits from Sun Life on January 18,

20    2011. The following definitions are applicable to Life Insurance WOP benefits:

21    "Total Disability or Totally Disabled for purposes of determining

22    eligibility for Waiver of Premium, means an Employee, because of

23    Injury or Sickness, is unable to perform the material and substantial

24    duties of any occupation for which he is or becomes reasonably

25    qualified for by education, training or experience."

26    11.    The provisions of The Policy regarding the meaning of "total disability" as set

27    forth in Paragraphs 9.A and 10 are superceded by contractually adopted standards of California

28    law due to the choice of law provision in The Policy alleged herein in Paragraph 4.D.

1    12.    In evaluating Plaintiff's claims for LTD and Waiver of Premium ("WOP")

2 benefits, Sun Life failed and refused to apply the proper standard of "totally disabled."

3 Notwithstanding the specific language of The Policy, as alleged in Paragraphs 9.A and 10, under

4 California law total disability within the meaning of the term "any occupation" as contained in a

5 general disability clause is that which prevents the insured from engaging in any occupation or

6 performing any work for compensation and which prevents him/her from working with

7 reasonable continuity in his/her customary occupation or in any other occupation in which he/she

8 might reasonably be expected to engage in view of his/her station and physical and mental

9 capacity. Therefore, California law requires an insurance company to consider: (A) whether the

10 claimant could reasonably be expected to work; recognizing that the fact that the insured may do

11 some work or even the fact that she may be physically able to do so is not conclusive evidence

12 that her disability is not total, if reasonable care and prudence require that she desist; (B) given

13 the claimant's physical and/or mental capacity; (C) and her station in life; (D) to perform the

14 "substantial and material" duties of her own occupation; (E) with "reasonable continuity;" and

15 (F) in the usual and customary way.

16    13.    Here, Sun Life failed and refused to:

17        A.    Utilize the proper standard of totally disabled in its communications with

18             Plaintiff.

19        B.    Utilize the proper standard of totally disabled in its evaluation of

20             Plaintiff's claim for benefits.

21        C.    Provide its medical or vocational evaluators with the proper criteria to

22             evaluate whether Plaintiff and was totally disabled.

23        D.    Therefore, every evaluation and conclusion Sun Life reached terminating

24             Plaintiff's LTD benefits and denying his appeal of that termination was

25             arbitrary and capricious. Sun Life failed and refused to apply the proper

26             standard of totally disabled and instead utilized the more restrictive and

27             legally unenforceable definition from The Policy as set forth in Paragraphs

28             9.A and 10.

1      14.     By letter dated January 27, 2011, Sun Life acknowledged receipt of Knipping's

2 claim for LTD benefits, identifying the policy owner as "Crowley Maritime Corporation." By

3 letter dated March 28, 2011, Sun Life approved payment of LTD benefits to Knipping effective

4 January 24, 2011.

5      15.     Thereafter, Knipping was granted life insurance WOP benefits.

6      16.     Knipping was awarded Social Security Disability ("SSDI") benefits by the Social

7 Security Administration ("SSA").

8      17.     By letter dated June 9, 2011, Sun Life acknowledged to Knipping that it was

9 aware that she had been approved for SSDI benefits and demanded repayment of a consequential

10 overpayment of $6,936.80.

11      18.     By letter dated June 24, 2011, Sun Life acknowledged receipt of Knipping's check

12 in the amount of $6,936.80, in full reimbursement of the overpayment on her LTD claim.

13      19.     On November 30, 2011, Sun Life utilizing an incorrect policy, concluded that

14 Knipping's claim was subject to a 24-month limitation for chronic fatigue, musculoskeletal, and

15 connective tissue illness limitations, which, in fact, are not in the relevant policy. At that time

16 Sun Life offered $28,256.08, as a total payout of Knipping's LTD benefits and $40,010.90, as a

17 total payout of Knipping's life insurance benefits. Knipping did not accept the offer.

18      20.     By report dated May 25, 2012, Frank J. Lichtenburger, M.D., Board certified in

19 internal medicine, provided a medical file review based on the information he was provided. He

20 concluded that an exact diagnosis would be impossible without the benefit of medical history and

21 physical examination but that a review of the "objective data in the medical records" supports

22 diagnoses of fibromyalgia and carpel tunnel syndrome. He concluded that the medical records

23 "support sedentary level of functioning" and "there is no description of significant impairment

24 from her condition that would preclude her from sedentary activity after January 2011." Dr.

25 Lichtenburger noted medical records showing diffuse musculoskeletal pain with muscle spasm,

26 underlying fibromyalgia by history, chronic pain syndrome, symptoms as being unable to use

27 right hand and inability to sit for long periods; capable off simple grasping but not firm grasping

28 or fine manipulation; ability to lift and carry 5 pounds but unable to type; review of symptoms is

1 positive for paresthesia in fingers; decreased range of motion in the lumbar spine and the cervical
2 spine; EMG listed bilateral median nerve entrapment at wrists; she has inability to type and pain
3 with sitting. She underwent myofascial release techniques to the cervical, thoracic, and
4 (lumbrosacral) regions with passive range of motion. She has had increased difficulty with neck
5 and arm pain and paresthesias in her arms and hands with symptoms getting worse as of January
6 3, 2012.

7      21.    On June 6, 2012, Sun Life obtained a file review from Peter M. Mirkin, M.D.,
8 psychiatric consultant. Based on limited records it provided to Dr. Mirkin. Dr. Mirkin noted that
9 Knipping was suffering from fibromyalgia, carpel tunnel syndrome, depression, anxiety, and
10 back problems. Dr. Mirkin was asked to evaluate "the documentation" in the file provided to
11 him and whether that documentation provided support for "an incapacitating psychiatric
12 disorder." He noted that: most records described chronic pain symptoms; therapy notes
13 indicated that Plaintiff's husband was terminally ill with cancer and that she was overwhelmed
14 with stress and was afraid of him dying and of not being there for him; after her husband passed
15 away therapy notes indicated that she was depressed and her house was depressing. Dr. Mirkin
16 concluded the records described Knipping's loss and grief over her husband's death which was
17 complicated by her discovery of financial problems and the need to sell or rent her house. Dr.
18 Mirkin was not asked to address and did not address the inter-relationship between Knipping's
19 psychiatric condition and her physical condition or the effects of her medications on her capacity
20 to function.

21      22.    On July 31, 2012, Sun Life's Lindsey Lajoie provided a vocational assessment
22 based on Dr. Lichtenburger's review. The review did not address the SSDI award, reasoned that
23 Knipping's occupation was sedentary but required frequent fingering, which means performing
24 the activity 34%-66% of the time but that since the occupation of a software engineer is "that of a
25 self-regulating occupation, so it appears that Ms. Knipping would have the ability to change
26 activities and take short breaks ever two hours. Also it appears an ergonomic keyboard would be
27 a reasonable accommodation."

28      23.    By letter dated July 31, 2012, Sun Life terminated Knipping's LTD benefits,

1  ostensibly relying upon Dr. Lichtenburger's, Dr. Mirkin's, and Ms. Lajoie's reports.

2      24.    By letter dated August 3, 2012, Sun Life terminated Knipping's life insurance
3  WOP benefit ostensibly relying upon the same information as it relied on to terminate her life
4  insurance WOP benefits.

5      25.    By letter dated August 8, 2012, Knipping appealed the termination of her benefits
6  noting that she had not spoken to or received any communication from Sun Life since February
7  2012 and no one had called to request a list of her doctors since November 2011 when she
8  notified Sun Life that she would be seeing new doctors because she had moved. She further
9  advised that most of the doctors whose records Sun Life had reviewed were doctors she had not
10  seen in many cases in more than a year. She provided a list of her then current treating
11  physicians.

12      26.    In response to Knipping's appeal Sun Life obtained a psychiatric file review by
13  Barry Klegman, M.D., dated November 7, 2012, and an addendum dated December 31, 2012.
14  Dr. Klegman concluded that overall the documentation provides insufficient support for an
15  incapacitating psychiatric disorder and that "the file contains insufficient evidence that the
16  insured's psychiatric symptoms substantially interfere with her functioning."

17      27.    Sun Life also obtained a file review by Dr. Jamie Lee Lewis, Board certified in
18  physical medicine and rehabilitation which report is undated.

19      28.    Sun Life also obtained a report from D. Dennis Payne, Jr., M.D., Board certified
20  in internal medicine and rheumatology, which report is also undated.

21      29.    Sun Life's medical reviewers (Drs. Lichtenberger, Mirkin, Klegman, Lewis and
22  Payne) conclusions are without any factual basis and do not constitute substantial evidence
23  because:

24          A.    Sun Life provided the physicians with incomplete evidence in order to
25          induce them to provide opinions supporting Sun Life's financial position.
26          B.    Dr. Payne and Dr. Lewis:
27              i.    Routinely provide opinions that substantiate termination of benefits
28              for insurance companies, using canned, repetitive language; and

ii.    Are not independent.

iii.    Routinely disregard the facts in medical records provided for their reviews.

C.    Non of Sun Life's medical reviewers was aware of or applied the proper standards of what constituted "totally disabled."

30.    Sun Life's vocational conclusions are without any factual basis and do not constitute substantial evidence because they: (i) Sun Life failed to consider all the facts; (ii) relied upon Sun Life's medical reviewers' opinions, which in turn were unsubstantiated; and (iii) failed to utilized the proper legal standards to what constitutes "totally disabled."

31.    By letter dated January 30, 2013, Sun Life denied Knipping's appeal from the denial of her benefits.

32.    Plaintiff has exhausted all administrative remedies required to be exhausted by the terms of the Plan and by ERISA.

33.    At all times mentioned herein Plaintiff was, and continues to be, totally disabled under The Policy's definition of totally disabled as properly construed, and therefore entitled to benefits under the terms of The Policy.

34.    ERISA section 503, 29 U.S.C. section 1133 provides:

"In accordance with regulations of the Secretary, every employee benefit plan shall –

(1)    provide adequate notice in writing to any participant, beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reason for such denial, written in a manner calculated to be understood by the participant, and

(2)    afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

35.    Sun Life is required to provide claimants full and fair reviews of claims for benefits pursuant to 29 U.S.C. section 1133 and its implementing Regulations. Specifically:

A.    The Secretary of Labor has adopted Regulations to implement the requirements of 29 U.S.C. section 1133. These Regulations are set forth

in 29 C.F.R. section 2560.503-1 and provide, as relevant here, that employee benefit plans, including Sun Life herein, shall establish and maintain reasonable procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations and that such procedures shall be deemed reasonable only if:

i. Such procedures comply with the specifications of the Regulations;

ii. The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, The Plan provisions have been applied consistently with respect to similarly situated claimants;

iii. Written notice is given regarding an adverse determination (i.e., denial or termination of benefits) which includes: the specific reason or reasons for the adverse determination; with reference to the specific plan provisions on which the determination is based; a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; a description of The Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following a denial on review; if an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and

that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

iv. Sun Life is required to provide a full and fair review of any adverse determination which includes:

a. That a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits;

b. A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information: (1) was relied upon in making the benefit determination; (2) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (3) demonstrates compliance with the administrative processes and safeguards required pursuant to the Regulations in making the benefit determination; or (4) constitutes a statement of policy or guidance with respect to the Plan concerning the denied benefit without regard to whether such statement was relied upon in making the benefit determination;

c. The Regulations further provide that for a review that takes into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

d. The Regulations further provide that, in deciding an appeal

of any adverse determination that is based in whole or in part on a medical judgment that the appropriate named fiduciary shall consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment;

e. The Regulations further require a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal nor the subordinate of such individual;

f. The Regulations further provide that a healthcare professional engaged for the purposes of a consultation for an appeal of an adverse determination shall be an individual who is neither the individual who was consulted in connection adverse benefit determination which was the subject of the appeal nor the subordinate of any such individual;

g. The Regulations further provide that, as to disability claims, the plan administrator "shall notify a claimant" of the plan's determination on review within a reasonable time not later than 45 days after receipt of the claimant's request for review by the plan unless special circumstances require an extension of time for processing the claim, in which case written notice of the extension shall be furnished to the claimant prior to the termination of the initial 45 day period and in no event shall such extension exceed a period of 45 days from the end of the initial period.

36. Sun Life denied Plaintiff a full and fair review of her claims for benefits:

    A. Sun Life does not have, or with respect to Knipping's claim and appeal, did not follow, administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the Plan provisions have been applied consistently with respect to similarly situated claimants;

    B. Sun Life, does not have, or with respect to Knipping's appeal, did not follow, the Regulations - - which require that a review take into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

    C. Sun Life failed and refused to provide all relevant documents to Plaintiff for use in her appeal;

    D. Defendant Sun Life otherwise violated the Regulations.

37. Sun Life has on ongoing history of unfair claims practices.

    A. In *Wilkerson v. Riffage.com Disability Income Protection Program, et al*, USDC Northern District of California, Case No.: C-03-04926 RMW, several documents produced by Sun Life were filed with the Court in support of the plaintiff's motion the establish the standard of review. Portions of this production include: A January 17, 1997, Sample Denial Letter addressed to "Iamma Faker. . . . Bah Hahbah. . . ."

    B. On September 25, 1997, Smith Group, on behalf of Sun Life gave a training session to Sun Life's claims adjusters entitled, "Sun Life of Canada Denial Training." The presentation was presented in slides that included the following:

| Slide No.: | Verbiage Included: |
|---|---|
| 9: | "Appeal should be a rubber stamp." |
| 10: | "Review with a Healthy Skepticism." |

C.  On February 16, 1998, Sun Life issued a Memorandum disavowing the Smith Group's booklet and training. It reported that Smith Group "has submitted a written apology to sun life. . . .and will be providing us with a supplemental training session in the near future." The written apology and the supplemental training session were not produced.

D.  Five years later, it continued its practice of denying as many claims as possible to save the company money as is evidenced below.

38.  A February 27, 2002, e-mail from Sun Life's Steve Bailey stated, they were having a rough month in LTD. "New claims are up for the month. Approvals are up slightly. Closes look good for now. But, Terms are way off. . . . Here's the challenge. In the next day and a half can we find 25 more Terms? This is just one per examiner. I know it is late in the month and this may not be doable, but please give it your best shot. 'YOU' can make a big difference. Can we kick it up a notch?"

39.  In an April 4, 2002, e-mail, Mr. Bailey wrote, "Boy, Did you 'kick it up a notch'!! While the numbers are still very preliminary, March was a very strong finish to the first quarter for Disability. STD made money for the second month. . . .and will be about $300,000 ahead of plan. . . .LTD made over $1.5 million in March vs a plan of $600,000. Fantastic! This will make up a good part of the tough month we had in Feb. . . . As a small expression of my gratitude, please join me tomorrow at 8:30 for coffee and bagels."

40.  A "Kick it Up a Notch" campaign was instituted by Sun Life to accelerate closing and terminating STD and LTD claims. A June 26, 2002, e-mail from Sun Life's Steve Bailey included the following:

> "Currently we are behind approximately $1,000,000 from the original plan projection for the month of June . . . Realistically it will be very difficult, if not impossible, to achieve the planned terminations/denials of 271 by the end of the month, especially considering that we are currently at 166 terminations/denials. We want to foster further enthusiasm. . . Toward improving our current results, as each proper claim resolution can have a very positive effect on the bottom line financial results for the month of June."

///

1    41.    In an effort to create and enthusiasm and recognize staff efforts, Sun Life

2 proposed a lottery where each appropriate closure/termination on Thursday/Friday would receive

3 an additional 3 chances and each appropriate closure/termination on Saturday or Sunday would

4 receive an additional 6 chances to win. The rewards were gift certificates in the amounts of $50,

5 $100, and $250.

6    42.    On June 27, 2002, Mr. Bailey rescinded the lottery because of the "possibility that

7 it could create a misunderstanding with respect to Sun Life Financial's philosophy concerning

8 the processing of disability claims. It has always been our position that claim determination be

9 based upon the policy terms and evidence submitted, and that a claim which meets the policy

10 requirements should be administered and paid in accordance with those terms. There has never

11 been any intention to suggest otherwise."

12    43.    On January 25, 2005, Mr. Bailey, who was given an "early retirement

13 arrangement" at the end of 2003, was deposed in the *Wilkerson* case. The deposition included

14 the following information:

15 |  | A. | When asked how claim decisions affect Sun Life's bottom line, he
16 |  |  | responded, in part, "If they were new claims coming in, it could have the
17 |  |  | consequence of making the bottom line look a little worse. If it was a
18 |  |  | claim that was closed, it could make it look better. . ."

19 |  | B. | In reference to the June 26, 2002, e-mail, Mr. Bailey was asked what he
20 |  |  | was referring to regarding the $1 million. He responded that it was the
21 |  |  | bottom line financial goal for the product for that month, in other words,
22 |  |  | profits.

23 |  | C. | If a claim was appropriately closed, it would have a positive impact on the
24 |  |  | profitability.

25 |  | D. | Mr. Bailey was asked Sun Life's response to his June 26, 2002, e-mail.
26 |  |  | He responded that he was called into his boss, told him the e-mail could be
27 |  |  | misinterpreted as to what Sun Life's intention was.

28 |  | E. | It could be interpreted that Mr. Bailey wanted people to close claims, "as

COMPLAINT
15

1   opposed to doing their job in an appropriate manner."

2   F.   An e-mail by Mr. Schmidt, a man Mr. Bailey supervised, was circulated

3        that said, "Our concentration has got to be on financial results for the next

4        few day – any overturns or approvals that will not create a customer

5        service for performance standard problem should be low priority."  Mr.

6        Bailey addressed it by saying "Remember, its about don't the right thing.

7        It's about treating our claimants fairly."  Mr. Bailey is not sure it was

8        contradictory to Sun Life's business practice, but he would want to clarify

9        it.  Mr. Schmidt's e-mail was retracted through Mr. Bailey, using verbiage

10       from his boss.

11  G.   Planned terminations for the month were posted on a white board the

12       employee's could see.  The numbers came from Product Actuary.

13  H.   Mr. Bailey testified his e-mail was intended only to get people to work

14       harder to get caught up on their backlog.

15  I.   Approving a claim has a financial impact because a reserve is set up on

16       that claimant for future payments.

17  J.   If an employee denied payment, they get a credit in the lottery system.

18  K.   Mr. Bailey testified employees were rewarded if a complimentary letter

19       was written, the letter would be posted and an e-mail sent thanking them

20       for going above and beyond.

21  44.  On January 27, 2005, Sun Life's former employee Sandra Decoff was deposed in

22  the *Wilkderson* case.  She testified, in part:

23  A.   She handled LTD appeals.

24  B.   If she signed a determination letter, she made the decision.

25  C.   When she received the June 26, 2002, e-mail from Mr. Bailey she thought

26       it was strange and discussed it with a co-worker wondering if they should

27       take it to legal.  The co-worker took it to legal.  The co-worker was Leann

28       Prior.

|  |  |  |  |
|---|---|---|---|
| 1 |  | D. | The June 26, 2002, e-mail was sent to LTD examiners. |
| 2 |  | E. | Ms. Decoff found the e-mail shocking because nothing had ever been said |
| 3 |  |  | about a "reward relative to terminations and denials" before. She was |
| 4 |  |  | aware of numbers being tracked on a white board. |
| 5 |  | F. | An actuarial person wrote projections for the month on the white board |
| 6 |  |  | and changed the numbers regarding new claims, granted, reopened, |
| 7 |  |  | denied, etc. She thought it was informational only. |

8  G. She ignored the memo asking for 25 more terminations in a day and a half
9  because "we were always informed . . . .that our jobs were to make
10  decisions, make the right decisions and not just terminations, denials,
11  approvals, reopens, whatever they might be."

12  H. Ms. Decoff did not get compensated for working weekends. She worked
13  about two weekends a month.

14  I. Employees were given an annual bonus based on how well the company
15  did that year.

16  J. Ms. Decoff had never heard or seen of an audit being done if approvals or
17  denials were too high.

18  45.  On March 30, 2005, Sun Life's Michael Shunney was deposed in the *Wilkerson*
19  case.

20  A. Mr. Shunney was vice president and general manager of group insurance
21  during the relevant time period.

22  B. There was a morale issue because people were being overworked. He was
23  very conscientious of his employees morale.

24  C. The June 26, 2002, e-mail was inconsistent with company policy.

25  D. He found the entire e-mail objectionable because of its reference to
26  terminations.

27  E. He would speculate that the e-mail did not influence the claims examiners.

28  F. He did not respond to Mr. Bailey's e-mail regarding 24 terminations in a

1    day and a half. He assumes he "would find that statement highly
2    objectionable."

3    G.    He would not find it objectionable that Mr. Bailey spoke with his
4          employees about financials.

5    46.   On March 31, 2005, Mr. Bailey was again deposed in the *Wilkerson* case. It was a
6    reconvening of Mr. Bailey's session in light of the subsequent production by Sun Life. He
7    testified, that:

8    A.    He never intended to measure "kicking it up a notch."

9    B.    Mr. Shunney sent Mr. Bailey an e-mail that Mr. Bailey understood to mean
10         to grow the LTD division. The kick it up a notch slogan in reference to the
11         LTD claims department getting work done on a timely basis

12   C.    Mr. Bailey believed they needed to grow the LTD – improve customer
13         service and turnaround times.

14   D.    Mr. Bailey testified that another e-mail was sent by him that could have
15         been misconstrued, but the intent was to get the backlog cleaned up ans
16         workloads cleared by the end of the month.

17   E.    The e-mail did not specify whether the pending claims were approved or
18         closed.

19   F.    Every month Mr. Bailey would report to Mr. Shunney how the disability
20         product did financially.

21   G.    He reported the amount of expenses, reserve changes and claim dollars,
22         not the actual numbers of closes and accepted claims.

23   H.    Reserves are set up based on an expectation of an average number of
24         months of disability.

25   I.    Though non-specific, the average claim was set up for less than a five year
26         disability. The reserve is charged to the claims department.

27   J.    If a claim was terminated, the reserve would be released. If the
28         termination was appealed, the reserve would be re-established until a

1               decision on appeal was made.

2      K.    Mr. Bailey's goal was to eliminate the backlog. There was no report of

3            backlogged claims. Backlog claims were claims action that was overdue.

4            Backlog was measured by Mr. Bailey walking through the department and

5            seeing how many stacks were on the examiner's desk. He would only

6            assume it was backlogged.

7      L.    Improving the disability department helped Sun Life stay in business as far

8            as timely decisions and customer service.

9      M.   Mr. Bailey was referred to a March 17, 2002, email in which he used the

10          fact that he asked for 25 "terminations" in one and half days and the

11          examiners terminated 24. He testified that "if the 24 claims weren't there

12          to be appropriately closed, it wouldn't have happened. . . . I don't think

13          anybody went out and said, gee, let's close 24 claims just to - - to make

14          Steve happy."

15      N.    People knew from training and refresher programs not to inappropriately

16          close or terminate claims just to achieve a number.

17      O.    Mr. Bailey did not know the number of backlogs or open files that were

18          cleared during the day and a half referenced, only the number of

19          terminations that were made.

20      P.    Employees were not asked to keep track of a backlog.

21      Q.   In reference to the April 4, 2002, e-mail from Mr. Bailey to his employees

22          congratulating them on the good numbers, backlog was not referenced nor

23          reduction to open claims was not referenced.

24    46.     Insurance industry expert, Stephen D. Prater submitted a Declaration as part of the

25  *Wilkinson* case. He explained that despite the retractions by management after-the-fact, Sun

26 Life's denial philosophy infected its decision-makers and caused them to continue to deny and

27 terminate claims inappropriately. He wrote, in part:

28         "A fundamental principle and standard of the insurance industry is,

1  that a claims handler must make claims decisions based on the
merits of each claim, without influence of any artificial or arbitrary
2  incentive or disincentive and certainly without any influence [of]
any monetary reward. In this case, with the head of the
3  Department emphasizing terminations, closures and the financial
performance of the Department, there is a strong likelihood that the
4  claims personnel were influenced, consciously or unconsciously, to
tend to deny otherwise worthy claims. These under influences,
5  rewards and/or penalties directly violate fair claims practices and
create a conflict of interest."

6

7  * * * *

8  "The claims department is not a profit center and any
communication to the claims handlers that suggests otherwise will
9  likely have a significant influence on their work, to the detriment
of the claimants. The claims handler's job is to pay covered claims
10  that are honestly made, without even the possibility that the handler
will be influenced by performance goals or the impact of granting a
11  claim on the company's bottom line."

12  * * * *

13  "Based on the materials provided, Sun Life created a corporate
environment where an inherent conflict of interest existed in the
14  claims department and claim denials and terminations that
occurred under the influence of the Department Head would
15  certainly be suspect."

16  47.  Sun Life continues its irresponsible practice of denying and terminating claims.

17       A.  A March 21, 2007, Sun Life advertisement states, "Everything we do,

18           from our services and programs to the contracts we sell, is geared toward

19           helping employees return to active, productive lifestyles. This focus can

20           help employers control the cost of benefits by maximizing productivity,

21           minimizing absences and reducing the costs for replacement workers."

22       B.  On June 24, 2010, Sun Life's Cory Williams, Director of Sun Life

23           Disability and Life Insurance, presented "Effectively Assess, Manage and

24           Resolve Short-And Long-Term Disability Claims." His information

25           included:

26           i.  Sun Life's mission is to assist plan sponsors in promoting the

27               health and well being of the plan members resulting in financial

28

1      peace of mind.

2                    ii.    In LTD, Sun Life has increased its controllable recoveries by

3                           34.5% over the past three years. "Of all LTD absence resolutions,

4                           90-percent resolved within two years, approximately 67-percent

5                           within the first year, an average duration of nine to ten months."

6                    iii.   "A return to a healthy and productive lifestyle. . . ." means

7                           significant savings for our plan sponsors and employee

8                           absenteeism and also for us, reducing the duration reduces the

9                           length of time we need to manage a claim. Therefore, increase in

10                          insurance and in turn, reducing absentees not to mention the impact

11                          on reserves."

12                   iv.    Regarding claims that are managed for both short term and long

13                          term disability, Sun Life has "51-percent better LTD recovery

14                          rates on average compared to companies where we manage the

15                          LTD only."

16                   v.     "Our joke within the operation, but its true, is that if it moves, we

17                          can measure it. This has allowed us to develop a lot of tools to

18                          help identify key opportunities so we have the right claims

19                          management plan on the right claims at the right point in time.

20                          This is critical to our success."

21     48.      In *Gross v. Sun Life Assurance Company of Canada*, USDC District of

22     Massachusetts, Case No.: 09-cv-11678-RWZ, Sun Life's Kathleen A. Peters submitted an

23     undated Affidavit.

24            A.     Her statements are in direct contradiction with the testimony of Messrs.

25                   Bailey and Shunney and Ms. Decoff, above:

26                   i.     Ms. Peters swore that "employees making the decisions do not

27                          consider the amount of potential benefits or the claims experience

28                          on a policy."

ii.     There is a white board with goals and reserve amounts written on it. The white board is posted outside the elevators where all claims personnel must pass in order to get to their desks everyday.

iii.     Mr. Shunney does not have a problem with financials being discussed with claims personnel.

iv.     Bonuses are awarded to employees based on the profitability of the company.

v.     The lottery and e-mails pushing for claim terminations does not support her statement.

vi.     The memo stating, "March was a very strong finish to the first quarter for Disability. STD made money for the second month. . . .and will be about $300,000 ahead of plan. . . .LTD made over $1.5 million in March vs a plan of $600,000. Fantastic! This will make up a good part of the tough month we had in Feb. . . . As a small expression of my gratitude, please join me tomorrow at 8:30 for coffee and bagels" does not support Ms. Peters' statement.

B.     Ms. Peters swore decision makers were evaluated based on their responsiveness to claimants, timeliness and quality of work product. Ms. Decoff testified that she had no knowledge of whether her work product was reviewed or not.

C.     Ms. Peters swore "No pressure is placed on decision makers to deny or terminate claims."

i.     The white board posted in plain view with goals that track reserves, and closes does not support this statement.

ii.     Memos pushing for 25 "Terms" in the next day and a half does not support this statement.

iii.     Memos asking for 271 closed files when there was currently 166 closes does not support her statement.

1    D.    Ms. Peters' statement that the Appeals Unit is maintained separately from

2          the unit that initially denied the claim is technically correct, but incorrect

3          in practicality. Ms. Decoff testified that they all share the same floor, but

4          are in unseparated sections. Appeals are in one area of the room, claims in

5          another, life insurance in another section and short term disability in

6          another section.

7    49.   If claims and appeals decisions were fair, unbiased, and based on the facts, Sun

8    Life would not be recurrently rendering unfair, factually unsupported decisions such as:

9          A.    Failure to explain discrepancy between its denial of benefits and SSA's

10               decision. *Costello v. Sun Life*, 2009 U.S. Dist. LEXIS 95828 (W.D.KY,

11               Oct. 14, 2009); *Delisle v. Sun Life*, 558 F.3d 440 (6th Cir. 2009).

12         B.    Invalid Vocational Reviews: *Panther v. Sun Life*, 464 F.Supp.2d 1116

13               (D. Kan 2006); *Bishop v. Sun Life*, 2007 U.S. Dist. LEXIS 3555 (E.D.KY.

14               Jan. 17 2007; *Levitian v. Sun Life*, 2011 U.S. Dist. LEXIS 49519 (May 6,

15               2011).

16         C.    Procedural Irregularities (Failure to Timely Decide Claim): *Solnin v. Sun

17               Life*, 2011 U.S. Dist. LEXIS 8834 (E.D.N.Y. Mar. 23, 2007); *Wenner v.

18               Sun Life*: Denial claim for one reason, terminated claim for another, 482

19               F.3d 878 (6th Cir. 2007).

20         D.    Improper emphasis on evidence favorable to denial/ignoring evidence

21               favorable to grant of benefits: *Lee v. Sun Life*, 676 F.Supp.2d (D.Or.

22               2009); *Delisle v. Sun Life*, 558 F.3d 440 (6th Cir. 2009); *White v. Sun Life*,

23               488 F.3d 240 (4th Cir. 2007); *Helm v. Sun Life*, 624 F. Supp.2d 1034

24               (W.D. Ark. Nov. 24, 2008).

25         E.    Unreasonable Explanation: *Costello v. Sun Life*: 2009 U.S. Dist. LEXIS

26               95828 (W.D.KY, Oct. 14, 2009): S/L's "conclusion does not follow from

27               the premise"; *White v. Sun Life*, 488 F.3d 240 (4th Cir. 2007).

28         F.    Reliance on UNTRUE, non-medical information: *Delisle v. Sun Life*, 558

1    F.3d 440 (6th Cir. 2009); *Levitian v. Sun Life*, 2011 U.S. Dist. LEXIS

2    49519 (May 6, 2011).

3         G.    Failure to Adequately investigate claim: *Lee v. Sun Life*, 676 F.Supp.2d

4               (D. Or. 2009).

5         H.    Disregarding pain: *Costello v. Sun Life*, 2009 U.S. Dist. LEXIS 95828

6               (W.D.KY, Oct. 14, 2009).

7         I.    Sun Life's application of offset provision lacked "reasoned basis": *Baxter*

8               *v. Sun Life Assurance Company of Canada*, Case No.: 09-cv-3818 (N.D.

9               Ill., June 7, 2011).

10   50.    Defendant's denial of Plaintiff's long-term disability and life insurance WOP

11   benefits was arbitrary and capricious, an abuse of discretion, and a violation of the terms of The

12   Policy.

13   51.    This Court is required to review the termination of Plaintiff's benefits *de*

14   *novo* because The Policy does not reserve discretion.

15   52.    If, for any reason, this Court determines that review is not *de novo*, then this Court

16   is required to review the termination of Plaintiff's LTD and life insurance WOP benefits with

17   minimal deference to Sun Life's determination because:

18        A.    Sun Life is both the administrator and the funding source of benefits for

19               The Plan, and therefore has a conflict of interest;

20        B.    Sun Life utilized medical experts to review Plaintiff's claim and appeal

21               who had a financial conflict of interest, and therefore did not provide a

22               neutral, independent review process;

23        C.    Sun Life failed to comply with ERISA's procedural requirements

24               regarding benefit claims procedures and full and fair review of benefit

25               claim denials.

26        D.    Sun Life's decision-making process was affected by its economic self-

27               interest.

28   53.    Sun Life is judicially estopped to contend that Plaintiff is not disabled from her

1    own or any occupation because:

2         A.    Defendant required Plaintiff to apply for SSDI.

3         B.    Plaintiff applied for SSDI benefits and was awarded such benefits in
4                which she asserted and established that she was entitled to SSDI benefits.

5         C.    The Social Security Administration ("SSA") necessarily determined that
6                Knipping was incapable of performing not only her own occupation but
7                any occupation in the national economy. Under the Social Security Act, a
8                person qualifies as disabled and thereby eligible for benefits only if her
9                physical or mental impairment or impairments are of such severity that he
10               is not only unable to do her previous work, but cannot, considering her
11               age, education, and work experience, engage in any other kind of
12               substantial gainful work which exists in the national economy. 42 U.S.C.
13               § 423(d)(2)(A). Disability under the SSA means inability to engage in any
14               substantial gainful activity by reason of any medically determinable
15               physical or mental impairment which can be expected to last for a
16               continuous period of not less than 12 months; . . . 42 U.S.C. § 423
17               (d)(1)(A).

18        D.    Sun Life was in a privity with Knipping in the SSA proceedings and
19               therefore with Knipping asserted therein that she could not perform her
20               own occupation or any occupation in the national economy, considering
21               her age, education, and work experience, and prevailed on that argument.

22        E.    By virtue of these facts Knipping acted in a trustee-like capacity for Sun
23               Life in obtaining that portion of her SSDI award which reduces Knipping's
24               LTD benefits; Sun Life and Knipping successfully asserted to the SSA that
25               she was incapable of performing any occupation in the national economy.

26        F.    Sun Life is therefore judicially estopped to make the opposite argument in
27               this action, that is, to argue that given her age, education and experience,
28               Knipping is capable of performing her own occupation or any occupation

1         in the national economy.

2       54.    An actual controversy has arisen and now exists between Plaintiff, on the one

3 hand, and Sun Life, on the other hand with respect to whether Plaintiff is entitled to long-term

4 disability and life insurance WOP benefits under the terms of The Policy.

5       55.    Plaintiff contends, and Sun Life disputes, that Plaintiff is entitled to LTD and life

6 insurance WOP benefits under the terms of The Policy because Plaintiff contends that at all

7 relevant times that she was and is disabled under the terms of The Policy.

8       56.    Plaintiff desires a judicial determination of her rights and a declaration as to

9 which party's contention is correct, together with a declaration that Sun Life is obligated to pay

10 LTD and life insurance WOP benefits, under the terms of The Policy, retroactive to the first day

11 her benefits were terminated, until and unless such time that Plaintiff is no longer eligible for

12 such benefits under the terms of The Policy.

13       57.    A judicial determination of these issues is necessary and appropriate at this time

14 under the circumstances described herein in order that the parties may ascertain their respective

15 rights and duties, avoid a multiplicity of actions between the parties and their privities, and

16 promote judicial efficiency.

17       58.    As a proximate result of Sun Life's wrongful conduct as alleged herein, Plaintiff

18 was required to obtain the services of counsel to obtain the benefits to which he is entitled under

19 the terms of The Policy. Pursuant to 29 U.S.C. section 1132(g)(1), Plaintiff requests an award of

20 attorneys fees and expenses as compensation for costs and legal fees incurred to pursue

21 Plaintiff's rights.

22                   **SECOND CLAIM FOR RELIEF**
        **(For Declaratory Relief for Remand and for a Full and Fair Review)**

23

24       59.    Plaintiff incorporates by reference Paragraphs 1 through 58, inclusive, of this

25 Complaint.

26       60.    Sun Life was required to accord Plaintiff a full and fair review of her claims for

27 LTD and life insurance WOP benefits and of her appeal of the termination of her LTD and life

28 insurance WOP benefits.

61. Sun Life failed to provide Plaintiff a full and fair review of her claims or a full and fair review of the appeal from the termination of her claims for LTD and life insurance WOP benefits.

62. Unless this Court determines that Plaintiff is entitled to LTD and life insurance WOP benefits retroactive to the date LTD and life insurance WOP benefits were terminated through the date of judgment and prospectively thereafter, this Court should remand the action to the claims administrator, Sun Life, and order Sun Life and accord Plaintiff a full and fair review of her claim for benefits and of any further appeals of the termination of her benefits.

WHEREFORE, Plaintiff prays judgment as follows:

1. For declaratory judgment against Sun Life, requiring Sun Life to pay long-term disability benefits and reinstate life insurance WOP benefits under the terms of The Policy to Plaintiff for the period to which she is entitled to such benefits, with prejudgment interest on all unpaid benefits, until Plaintiff is no longer eligible for such benefits under the terms of The Policy.

2. For attorneys fees pursuant to statute against Sun Life.

3. For costs of suit incurred.

4. For such other and further relief as the Court deems just and proper.

Date:  May $\mathcal{5}O$, 2013

ROBERT J. ROSATI, No. 112006

Attorney for Plaintiff,
KAREN KNIPPING